[No. B099108. Second Dist., Div. Three. Apr. 1, 1999.]

LASZLO LOGACZ et al., Plaintiffs and Appellants, v.
RAYMOND LIMANSKY, Defendant and Respondent.

**COUNSEL**

Tanke & Willemsen, Tony J. Tanke, Karen Bautista Hobin; Law Offices of Manuel Hidalgo, Manuel Hidalgo and Rolando Hidalgo for Plaintiffs and Appellants.

Rushfeldt, Shelley & Drake, Randall L. Shelley, Christine T. Hoeffner and Dawn Cushman for Defendant and Respondent.

**OPINION**

**CROSKEY, Acting P. J.**—This is a medical malpractice case in which Cynthia Logacz, the wife and mother, respectively, of the plaintiffs, Laszlo Logacz and Heath B. Dunnam, died allegedly as the result of the professional negligence of the defendant Raymond Limansky, M.D. Cynthia died

on June 4, 1992 of pulmonary emboli, approximately two weeks after a hysterectomy performed by Dr. Limansky. Plaintiffs filed this action against Dr. Limansky and several other defendants.[1] Following a trial during which the trial court refused to give a jury instruction on concurrent causation (BAJI No. 3.77), the jury found that while Dr. Limansky was indeed negligent in his care of Cynthia, such negligence was not a cause of her death. Plaintiffs appeal and assert as the sole claimed error, the trial court's refusal to give the aforesaid requested instruction.

Because we conclude that, in this case, in which causation was the most critical contested issue and in which there was substantial evidence of multiple causes of Cynthia's death, the trial court improperly instructed the jury with respect to concurrent causation and because such error was clearly prejudicial, we reverse and remand for a new trial.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

Cynthia died in the emergency room of Brea Community Hospital on June 4, 1992, of pulmonary emboli. A summary review of the medical events which preceded her death is appropriate.

In January of 1992, Cynthia was experiencing vaginal bleeding. She was referred to and sought treatment from Dr. Limansky, a gynecologist. She was obese (she weighed over 300 pounds) and suffered from high blood pressure and blood in her stools. She took birth control pills, was short of breath, tired easily, and led a sedentary life during the time she was treated by Dr. Limansky.

Dr. Limansky performed a dilation and curettage (D&C) on Cynthia in an attempt to stop the bleeding on January 30, 1992. When that did not stop the vaginal bleeding, Dr. Limansky scheduled her for a hysterectomy. That operation was performed on May 18, 1992. She remained in the hospital for four days before being discharged to her home on May 22, 1992. During her recuperation in the hospital, on May 20, 1992 (two days after her hysterectomy surgery), Cynthia suffered a dizzy or fainting spell and fell. The nurses

---

[1]Plaintiffs filed suit against several other doctors as well as the Brea Community Hospital. The claims against all defendants except Dr. Limansky and a Dr. Gregory Maddex were disposed of by settlement or otherwise. The jury found in favor of Dr. Maddex and plaintiffs do not appeal from the judgment in his favor.

[2]Since the only contention on appeal related to a jury instruction, "[i]n assessing an instruction's prejudicial impact, we cannot use the view of the evidence and inferences most favorable to the [prevailing party]. [Citations.] Instead, we must assume the jury might have believed [appellant's] evidence and, if properly instructed, might have decided in [appellant's] favor. [Citations.]" (*Shell Oil Co.* v. *Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 773 [15 Cal.Rptr.2d 815].) Accordingly, we state the facts most favorably to the party appealing the instructional error alleged, in accordance with the customary rule of appellate review. (*Sills* v. *Los Angeles Transit Lines* (1953) 40 Cal.2d 630, 633 [255 P.2d 795].)

on duty at the time called Dr. Limansky to report the incident. He ordered an immediate electrocardiogram (EKG). Although the EKG test results were abnormal[3] and suggested a possible obstruction of her blood supply, Dr. Limansky failed to direct a cardiac workup for Cynthia prior to her release from the hospital.

On Saturday, May 30, 1992, about 8:00 p.m., while convalescing at home, she suffered another dizzy spell and had to be taken by paramedics to the emergency room of the Brea Community Hospital where she was admitted and was described as having fainted (a syncopal episode). There, she was treated by a Dr. Maddex. An examination of Cynthia revealed that she had an elevated temperature of approximately 100 degrees. Dr. Maddex ordered an EKG which again showed an abnormal result, again suggesting ischemia, a blockage of circulation, and tachycardia or rapid heart rate. Dr. Maddex ordered Cynthia's records from Queen of the Valley Hospital (where the hysterectomy had been performed). He then called Dr. Limansky at approximately 12:31 a.m. on Sunday, May 31, to confer about Cynthia's diagnosis and treatment. Despite the abnormal test results, Dr. Limansky determined that she could be discharged, indicating that he could see her on the subsequent Monday if there was a problem. She was accordingly released from Brea Community Hospital shortly at 12:40 a.m. on Sunday, May 31, 1992.

Cynthia was seen by Dr. Limansky on June 2, 1992.[4] She apparently had no complaints at that time and he noted in his records: "Skin healing well. Will see here in six weeks." He did not request or review the records from her May 30 visit to the emergency room of Brea Community Hospital.

On the afternoon of June 4, 1992, Cynthia experienced chest pain. She looked pale, appeared to be staring off into space, was having trouble breathing and simply did not look well. Her son, Heath, did not remember his mother ever complaining about not feeling well until the day she passed away. Cynthia's husband instructed Heath to call 911. When the paramedics first arrived, Cynthia refused to go to the hospital and sent the paramedics away.

However, shortly thereafter, a second call was made to the paramedics, and Cynthia finally went to the emergency room, arriving at 4:54 p.m. on June 4, 1992. She complained of right-sided chest pain and mid-abdominal pain. She also complained of shortness of breath. She had a pulse rate of

---

[3]The computer-generated report on the EKG read: "sinus tachycardia. ST and T wave abnormality. Consider inferior ischemia. Abnormal E.K.G. unconfirmed."

[4]That was her previously scheduled postoperative appointment. For that reason, she apparently did not go and see Dr. Limansky on Monday, June 1.

142, respiration rate of 40, and blood pressure of 157/50. The emergency room doctors suspected pulmonary emboli and considered using the drug heparin. However, they held their order for heparin because they were so concerned about the risk of internal bleeding. Cynthia went into cardiac arrest at 5:33 p.m., just over 35 minutes after her arrival at the hospital. Despite efforts to revive her, she died on June 4, 1992, at 6:10 p.m. A subsequent autopsy determined that the cause of death was acute pulmonary thromboembolism, bilateral.[5]

Plaintiffs, as the surviving husband and son of decedent, filed an action for wrongful death. During the course of the six-week trial, complicated expert and percipient medical testimony was presented by both plaintiffs and defendant on nearly every phase of decedent's medical care, through and including forensics.

As experts for both parties experts testified, obesity and sedentary living are factors which increase the risk that a recovering surgical patient will suffer from circulatory problems and possible blood clotting. The experts further agreed that: (1) signs and symptoms of cardiac blockages include fainting, shortness of breath, rapid heartbeat and dizziness; and (2) that an OB-GYN should recognize these signs and symptoms, and their potential effects. Plaintiffs' expert, a Dr. Forbes, testified further that the standard of care for OB-GYN practitioners in 1992 was to prescribe the wearing of pressure or compression stockings to obese patients recuperating from surgery in order to prevent clotting and also to consult with an internist or cardiologist following an abnormal EKG. Although decedent had abnormal test results after her surgery and prior to her death which suggested possible circulatory blockages, neither Dr. Limansky nor the emergency room doctor, Dr. Maddex, prescribed any medication to prevent clotting or did follow-up testing to further diagnose the abnormal EKG results.

The medical testimony presented during trial by the several attending physicians and experts was extensive and conflicting on the issue of legal cause. Accordingly, plaintiffs requested that BAJI No. 3.77 on concurring

---

[5]At trial, the pathologist testified that he found that a coiled, twisted blood clot had lodged in the main pulmonary artery; it lodged in the area of the main pulmonary artery where it branches into arteries to supply blood to the left and right lungs. The clot's occlusion (blockage) was complete in the entire intersection. The clot completely plugged the pulmonary artery. The coiled appearance of the clot was significant according to the pathologist. A clot that *originates* in the pulmonary artery will be layered, not coiled. If a clot is in the shape of a spiral or coil, as here, it indicates that it came from a distant location. The embolus twists as it travels the blood stream. The spiral form of the clot can be viewed with the naked eye. Most clots with a coiled appearance come either from the legs or from the pelvic or abdominal area.

causes be given to the jury. However, the trial judge flatly refused,[6] stating that it was not "properly tailored" for a wrongful death case.[7] The jury subsequently returned a special verdict, finding defendant negligent in his care and treatment of decedent. However, the jury also found, by a vote of nine to three, that defendant's negligence *did not cause* Cynthia's death. As a result, the court entered judgment in favor of Dr. Limansky. Plaintiffs filed this timely appeal.

## ISSUE PRESENTED

This case presents two simple issues for resolution. First, did the trial court err when it refused to give BAJI No. 3.77 as requested by plaintiff? Second, if so, was such error prejudicial? We answer both of these questions in the affirmative.

## DISCUSSION

### 1. *Standard of Review*

The sole error claimed in this case is the trial court's failure to give a requested jury instruction on concurrent causation (BAJI No.

---

[6]Without any real warning, at least as far as the record reflects, the trial court summarily denied the plaintiffs' request:

"The Court: 3.77 the court will not give. It's not in proper form for the court to give based on the way it's been presented to the court in this case. Although I did bring it up for reconsideration. I did not—no modifications were made to the one that was given to the court. It's not appropriate. That's the court's ruling on that. Is there anything else we need to address, Mr. Hidalgo, Mr. Shelley, Mr. Thomas?

"Mr. Hidalgo: Is the 3.77—you're referring to the one that I gave to court or the one that was shown to us this morning. Those are two different ones.

"The Court: The one that you had previously given to me, I don't think the way it's done applies. It is not appropriate for this case either with the terminology that you used. I don't think it was properly tailored. It's a wrongful death case.

"Mr. Hidalgo: Can I just take a quick look at it, please.

"The Court: It refers to injury, and this is a wrongful death. Okay. All right. So I don't think it's appropriate with the language. And that was the one given to me yesterday. The one I proposed this morning, no one suggested modification to it. So it's still not in proper form. So I don't think it was redacted in such a fashion that it can be utilized for this case.

"Mr. Hidalgo: For the record, I believe that—may I just make a statement for the record.

"The Court: No, sir. That's my ruling. When you give me an instruction, and it's not right, I don't have to accept it. And that's the court's ruling. Okay. All right."

[7]BAJI No. 3.77 on concurring causes, as submitted by plaintiffs provided: "There may be more than one cause of an injury. When negligent conduct of two or more persons contributes concurrently as a cause of an injury, the conduct of each is a cause of the injury regardless of the extent to which each contributes to the injury. A cause is concurrent if it was operative at the moment of the injury and acted with another cause to produce the injury."

3.77).[8] ■ With respect to our review of issues relating to such an issue, as well as the question of their prejudicial impact, we do not view the evidence in the light most favorable to the successful defendant and draw all inferences in favor of the judgment. Rather, we must assume that the jury, had it been given proper instructions, might have drawn different inferences more favorable to the losing plaintiff and rendered a verdict in plaintiff's favor on those issues as to which it was misdirected. (*Henderson* v. *Harnischfeger Corp.* (1974) 12 Cal.3d 663, 674 [117 Cal.Rptr. 1, 527 P.2d 353]; *Krotin* v. *Porsche Cars North America, Inc.* (1995) 38 Cal.App.4th 294, 298 [45 Cal.Rptr.2d 10]; *Mock* v. *Michigan Millers Mutual Ins. Co.* (1992) 4 Cal.App.4th 306, 322 [5 Cal.Rptr.2d 594]; see also fn. 2, *ante*.)

■ That is not to say, however, that a failure properly to instruct a jury is necessarily or inherently prejudicial. There is no *automatic* reversal merely because a trial court has failed to properly instruct a jury. (*Soule* v. *General Motors Corp.* (1994) 8 Cal.4th 548, 580 [34 Cal.Rptr.2d 607, 882 P.2d 298].) "A judgment may not be reversed for instructional error in a civil case 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' (Cal. Const., art. VI, § 13.)" (*Ibid.*)

Instructional error in a civil case is prejudicial " '[w]here it seems probable' " that the error prejudicially affected the verdict. (*LeMons* v. *Regents of University of California* (1978) 21 Cal.3d 869, 875 [148 Cal.Rptr. 355, 582 P.2d 946]). It is not enough that there may have been a "mere possibility" of prejudice. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836-837 [299 P.2d 243].) As the *Soule* court put it, the determination of prejudice depends heavily on "the particular nature of the error, including its natural and probable effect on a party's ability to place his full case before the jury. [¶] . . . Actual prejudice must be assessed in the context of the individual trial record. For this purpose, the multifactor test set forth in such cases as *LeMons* [v. *Regents of University of California, supra,* 21 Cal.3d at pp. 875-876] and *Pool* [v. *City of Oakland* (1986) 42 Cal.3d 1051, 1069 [232 Cal.Rptr. 528, 728 P.2d 1163]] is as pertinent in cases of instructional omission as in cases where instructions were erroneously given. Thus, when deciding whether an error of instructional omission was prejudicial, the court must also evaluate (1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Soule* v. *General Motors Corp., supra,* 8 Cal.4th at pp. 580-581.)

In our consideration of the instructional error involved here, we will apply these principles.

---

[8]See footnote 6, *ante*, and footnote 9, *post*.

*2. The Trial Court Erroneously Refused to Give Plaintiffs' Requested Instruction on Concurrent Causation (BAJI No. 3.77)*

██  Without doubt, one of the critical issues to be resolved by the jury was causation. Just what did cause Cynthia's death? Dr. Limansky argued that (1) Cynthia's own family may have caused or contributed to it, (2) her physical condition (e.g., her sedentary lifestyle, and her obesity and high blood pressure and heart rate) may have caused it, (3) her failure to follow her doctors' instructions (including those of Dr. Limansky) regarding her postsurgical and posthospital activities may have caused it, and (4) her failure to seek *timely* emergency treatment after onset of chest pain and breathing difficulties may have caused it. For purposes of this appeal, plaintiffs concede that these factors may have contributed to Cynthia's death, but that the negligence of Dr. Limansky, *which the jury found*, was also a cause. Thus, the principle of concurrent causation was and is a critical part of plaintiffs' case.

██  "Parties have the 'right to have the jury instructed as to the law applicable to all their theories of the case which were supported by the pleadings and the evidence, whether or not that evidence was considered persuasive by the trial court.' [Citation.] 'A reviewing court must review the evidence most favorable to the contention that the requested instruction is applicable since the parties are entitled to an instruction thereon if the evidence so viewed could establish the elements of the theory presented. [Citation.]' [Citation.]" (*Maxwell* v. *Powers* (1994) 22 Cal.App.4th 1596, 1607 [28 Cal.Rptr.2d 62].) Consistent with these legal principles, plaintiffs requested that the trial court give BAJI No. 3.77[9] which would have made it clear to the jury that there can be more than one cause of an injury (or death).

██  This instruction adequately and correctly states the law governing concurring causes. (*Fish* v. *Los Angeles Dodgers Baseball Club* (1976) 56 Cal.App.3d 620, 631 [128 Cal.Rptr. 807, 91 A.L.R.3d 1], disapproved on other grounds in *Soule* v. *General Motors Corp., supra,* 8 Cal.4th 548.) The Use Note to BAJI No. 3.77 states that "Except as noted, *this instruction should be given immediately following BAJI 3.76 whenever the issue of*

---

[9]BAJI No. 3.77, which is titled "Concurring Causes," in its entirety provides: "There may be more than one cause of an injury. When [[negligent] [or] [wrongful] conduct of two or more persons] [or [[negligent] [or] [wrongful] conduct and a defective product]] contribute[s] concurrently as [a] cause[s] of a injury, [the conduct of] each is a cause of the injury regardless of the extent to which each contributes to the injury. A cause is concurrent if it was operative at the moment of injury and acted with another cause to produce the injury. [It is no defense that the [negligent] [wrongful] conduct of a person not joined as a party was also a cause of the injury.]"

*negligence of two or more defendants or contributory negligence is submitted to the jury.*" (Use Note to BAJI No. 3.77 (8th ed. 1994 bound vol.) p. 100, italics added.)

One purpose of BAJI No. 3.77 is to explain to the jury that plaintiff need not prove that the defendant's negligence was the sole cause of plaintiff's injury in order to recover. Rather, it is sufficient that defendant's negligence is *a* legal cause of injury, even though it operated in combination with other causes, whether tortious or nontortious. (*Espinosa v. Little Co. of Mary Hospital* (1995) 31 Cal.App.4th 1304, 1321 [37 Cal.Rptr.2d 541]; *Harris v. City of Compton* (1985) 172 Cal.App.3d 1, 10 [217 Cal.Rptr. 884], citing *American Motorcycle Assn. v. Superior Court* (1978) 20 Cal.3d 578, 586 [146 Cal.Rptr. 182, 578 P.2d 899].)

The fundamental importance of BAJI No. 3.77 in any case in which concurrent causes may be present has been repeatedly emphasized. (See *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 958, 977, 982 [67 Cal.Rptr.2d 16, 941 P.2d 1203] ["Instruction on the limits of the plaintiffs' burden of proof of causation, together with the standardized instructions defining cause-in-fact causation under the substantial factor test (BAJI No. 3.76) and the doctrine of concurrent proximate legal causation (BAJI No. 3.77) will adequately apprise the jury of the elements required to establish causation."]; *Milwaukee Electric Tool Corp. v. Superior Court* (1993) 15 Cal.App.4th 547, 565 [19 Cal.Rptr.2d 24] ["In apportioning fault, there may be more than one legal cause, *and a jury should be instructed accordingly . . . .* see BAJI Nos. 3.76 and 3.77, regarding the substantial factor test for causation and concurring causes . . ." (Italics added).]; *Doupnik v. General Motors Corp.* (1990) 225 Cal.App.3d 849, 865-867 [275 Cal.Rptr. 715] ["The concurrent cause instruction does not distinguish between active and passive legal causes."]; *Espinosa v. Little Co. of Mary Hospital, supra,* 31 Cal.App.4th at pp. 1317-1318, 1321-1322 ["[W]here a defendant's negligence is a concurring cause of an injury, the law regards it as a legal cause of the injury, regardless of the extent to which it contributes to the injury." (Italics omitted.)]; *Fraijo v. Hartland Hospital* (1979) 99 Cal.App.3d 331, 347 [160 Cal.Rptr. 246] ["[Concurrent causation] aptly describes the conduct of two or more health providers working in common cause to care for a patient in a hospital setting. Since the trial judge *did* instruct on 'concurrent' causes, we find that the instructions given were adequate." (Italics added.)].)

██ This case presents the same situation discussed in *Espinosa v. Little Co. of Mary Hospital, supra,* at pages 1317-1322, and *Hughey v. Candoli* (1958) 159 Cal.App.2d 231, 240 [323 P.2d 779]. The jury found Dr.

Limansky had been negligent. At issue was whether his negligence "caused" Cynthia's death. Dr. Limansky presented expert evidence that Cynthia's obesity and failure to follow medical instructions and seek timely treatment may have caused her death. Just as in *Hughey* v. *Candoli*, even if Dr. Limansky established as a matter of law that any one or all of these factors was *a* cause of Cynthia's death, his negligence could also have been *a* cause of her death acting in combination with them. Multiple or concurring causes of Cynthia's death do not preclude recovery by plaintiffs. However, the court failed to instruct the jury on concurrent causes. The jury was never specifically told that a defendant's negligence, even in the presence of the negligence of others, can also be found to be a legal cause. Plaintiffs were entitled to such an instruction.

Dr. Limansky argues that the trial judge was justified in refusing the requested instruction since it referred to an *"injury"* instead of a *"death"* and that the jury would have been confused. We disagree. This exact circumstance arose in *Fish* v. *Los Angeles Dodgers Baseball Club, supra,* 56 Cal.App.3d 620, disapproved on *other* grounds by *Soule* v. *General Motors Corp., supra,* 8 Cal.4th at pages 575-581. In *Fish,* the court disposed of the same argument made here by Dr. Limansky. "Defendants argue that the instructions proposed were not in the proper form to be used by the court, and rely upon the principle that in order to complain on appeal an aggrieved party must show that he requested 'a specific and correct instruction.' [Citation.] They add that though the trial court has the power to modify a requested instruction, it has no duty to make such modification and may properly reject a requested instruction that is erroneous or incomplete. [Citation.] The rule of these cases, however, is not intended to sanction the kind of nitpicking which defendants' criticism of proposed BAJI instruction No. 3.77 entails. Defendants contend that the instruction is incorrect because 'death' should be used in place of 'injury.' . . . The situation, therefore, is governed by the holding in *Laird* v. *Moss,* 173 Cal.App.2d 48, 53 . . . : 'The few redundant words could have been crossed out with the stroke of a pen. The imperfections were on a par with clerical errors that are easily corrected. Such trivial inaccuracies do not justify the refusal of an instruction where the result would be to leave the jury inadequately instructed on a material issue in the case. The instruction should have been corrected by the [this] court and given.' " (56 Cal.App.3d at p. 640.)

We cannot distinguish this case from *Fish.* We also see no reason why the trial judge could not have made the interlineation change required to conform the printed instruction to the particular facts of this case if a realistic concern existed that the jury might have been confused by the reference to "injury." In that regard, we have some question about the sincerity of that

expression of concern since neither the trial court nor Dr. Limansky's counsel had much problem with the use of the word "injury" in a number of other instructions (see fn. 12, *post*).

### 3. *The Trial Court's Instructional Error Was Prejudicial*

It is clear from this record that causation was the critical issue as to which the parties and their expert witnesses were clearly divided. It is plaintiffs' position that Dr. Limansky negligently failed to diagnose Cynthia's postsurgical problems as being due to pulmonary emboli. Specifically, and viewing the evidence in the light most favorable to the plaintiffs, the expert evidence which they offered (Dr. Forbes) reflected that Dr. Limansky's care and treatment of Cynthia fell below the standard of care in that (1) he failed to consult an internist or cardiologist following her abnormal EKG on May 20, 1993, (2) despite awareness of her abnormal emergency room EKG on May 30, her symptoms of rapid pulse and respiratory rates and her prior history, he failed to insist that she be admitted as a patient to Brea Community Hospital, (3) he made no inquiries concerning the May 30 emergency room visit nor made any progress note of it, and (4) he failed to prescribe Cynthia postoperative use of compression stockings as a prophylactic to prevent blood clots.

Plaintiffs' expert evidence as to causation (Dr. Schapira) tended to prove that Cynthia suffered from pulmonary emboli at all times from and after May 20, 1993, approximately two weeks prior to her death and was thereafter discoverable, and that the condition was treatable as late as June 2, 1993, just two days before her death. Such treatments that were available included blood-thinning drugs, a blood filter inserted in decedent's large veins and the prescription of compression stockings. None of these things were done by Dr. Limansky during his treatment of Cynthia, and the jury could reasonably infer, since the cause of death was admittedly pulmonary emboli, that the failure to properly and timely diagnose and treat decedent's condition was *a* substantial factor in causing her death.

Dr. Limansky argues that no expert expressly testified to that effect. That is not entirely accurate; such testimony was effectively presented. However, the problem with such testimony arises because the opinions of plaintiffs' causation expert were severely and unfairly limited by defense counsels' repeated assertion of technical objections which, in our view, were improperly sustained by the trial court.[10] Nonetheless, viewing the evidence in the light most favorable to the plaintiffs, there appears to be sufficient evidence

---

[10]Relying upon a stipulation limiting Dr. Schapira to causation testimony, the trial court narrowly and unfairly circumscribed his testimony. For example, every attempt to provide foundational testimony and to explain the basis for his causation opinion by reference to

presented to have permitted the jury to reasonably infer that Dr. Limansky's acts and omissions in his care and treatment of Cynthia was *a* substantial factor in her death.

As we have noted, instructional error requires reversal " ' "where it seems probable" that the "error prejudicially affected the verdict." ' " (*Rutherford* v. *Owens-Illinois, Inc., supra,* 16 Cal.4th at p. 983, quoting *Soule* v. *General Motors Corp., supra,* 8 Cal.4th at pp. 573-580.) "To prevail on a claim of instructional error, the appellant must show a reasonable probability of a more favorable result in the absence of the error. This determination depends heavily on the particular nature of the error, and its effect on the appellant's ability to place his or her full case before the jury. Actual prejudice must be assessed in the context of the trial record; article VI, section 13 of the California Constitution requires us to examine 'the entire cause, including the evidence' to determine whether the verdict was prejudicially affected." (*Daum* v. *SpineCare Medical Group, Inc.* (1997) 52 Cal.App.4th 1285, 1313 [61 Cal.Rptr.2d 260].) Relying on *Soule,* one court recently summarized the rule: " 'In assessing prejudice from an erroneous instruction, we consider, insofar as relevant, "(1) the degree of conflict in the evidence on critical issues [citations]; (2) whether respondent's argument to the jury may have contributed to the instruction's misleading effect [citation]; (3) whether the jury requested a rereading of the erroneous instruction [citation] or of related evidence [citation]; (4) the closeness of the jury's verdict [citation]; and (5) the effect of other instructions in remedying the error [citations]." ' " (*Melaleuca, Inc.* v. *Clark* (1998) 66 Cal.App.4th 1344, 1366 [78 Cal.Rptr.2d 627].) We discuss these issues in turn.

### a. *Evidentiary Conflict*

This was a hard-fought case. Conflicts in the evidence on critical causation issues here were sharp and extensive. Plaintiffs' testimony and that of their experts differed widely from that of Dr. Limansky and his witnesses regarding almost every factual element of the case. Cynthia had two separate surgeries performed by Dr. Limansky assisted by other medical personnel.

---

Cynthia's treatment by Dr. Limansky and other doctors was objected to on the ground that such testimony went to "standard of care," not causation. Inexplicably, the trial court repeatedly sustained these objections, apparently not recognizing that testimony regarding the past treatment of Cynthia and the viability, efficacy and availability of treatment options might well be, *and often is,* relevant to *both* standards of care and causation. If the testimony properly pertained to causation, it should have been allowed even though it might also have been relevant to the standard of care issue. The trial judge's rulings on this point were truly unfortunate. The consequences to the presentation of plaintiffs' case were dramatic and could only have had an unfair negative impact on the credibility and effectiveness of plaintiffs' expert testimony.

Other physicians were involved in treating her during her recuperation in the hospital after these surgeries. Emergency room doctors, in consultation with Dr. Limansky, also treated her when she was admitted for urgent care. Lastly, it was also asserted by Dr. Limansky's experts that Cynthia's own condition of obesity and her relative inactivity were substantial factors giving rise to pulmonary emboli, resulting in her death. It is obvious that such evidence would support the conclusion that any one of these factors, or possibly several of them operating *concurrently*, may each have been substantial factors in causing Cynthia's death.

Both parties' experts testified that obesity and sedentary living are factors known to increase the risk that a recovering surgical patient will suffer circulatory problems and possible blood clotting. Plaintiffs' obstetric and gynecology expert, Dr. Forbes, also testified that standard prophylactic care for an obese patient recuperating from a full hysterectomy who was experiencing dizziness, rapid heartbeat, and shortness of breath would be to prescribe wearing pressure or compression stockings and to further monitor any abnormal test results. Dr. Limansky's obstetric and gynecological expert, Dr. Parks, took direct issue with each of these suggested practices, stating that while they were used by some doctors they were neither required, nor the standard of practice, nor effective. He further testified that the number one symptom of a pulmonary embolus is chest pain and that without that symptom, increased breathing rates or shortness of breath, and rapid heart rate alone would not indicate a pulmonary embolus in a patient, but could merely be a normal side effect of obesity.[11]

This state of the evidentiary record clearly establishes that full and complete jury instructions on causation were critical.

### b. *Argument of Counsel*

Defense counsel's closing argument focused the jury's attention on these very conflicts in the expert testimony. It was argued: ". . . you've heard testimony, and it might even be difficult to hear testimony from a number of people who qualified as what we have referred to as 'experts.' Experts tend to disagree in trials. I think you've seen that in this particular case." These sharp conflicts in the evidence about what symptoms and warning signs are present with a pulmonary embolus and what precautions should have been taken with the decedent to prevent her death, strongly suggest that if an appropriate instruction on multiple or concurrent causes was given to the jury a verdict more favorable to plaintiffs was probable.

---

[11]We note, however, that since the jury found that Dr. Limansky had been negligent, plaintiffs' evidence regarding the standard of care and Dr. Limansky's failure to meet that standard was apparently accepted.

In both opening statement and closing argument, defense counsel emphasized the principal contention, that nothing Dr. Limansky did *caused* Cynthia's death. That unfortunate outcome was due to her own circumstances. For example, in his opening statement counsel asserted: "[N]othing, nothing either of these physicians did, caused or contributed to the death of this patient . . . this patient died from a minutes old thromboembolus, which blocked all circulation to both lungs and killed her suddenly, acutely on June 4th, 1992; and that in all probability, it was due to the fact of her morbid obesity, her sedentary nature, and all of the consequences of those two things." These statements highlight the serious consequences which can flow from a failure to give a concurring causation instruction. The multiple possible causes of decedent's death were emphasized, but the jury was never told how to evaluate, weigh, or compare those causes. Rather, it was led to believe, based on defense counsel's argument, that a number of causes mandated a defense verdict.

### c. *Impact of Other Instructions*

Dr. Limansky also argues that other instructions adequately addressed the question of multiple causation and its effect on the jury's determination of cause. We again disagree. None of the other instructions he cites tell the jury in plain language that there can be more than one cause of injury or that any negligent conduct that contributes substantially is *a* cause. Dr. Limansky argues that the jury *was* properly instructed on the concurring cause principle by virtue of the following instructions which were given: BAJI Nos. 2.60 (evidentiary burdens), 3.53 (defining contributory negligence), 3.76 (defining *legal* cause), 6.28 (impact of contributory negligence) and 14.91 (jury's function in evaluating negligence). However, we agree with plaintiffs that none of these instructions adequately addressed the basic legal principle which is at the heart of this case.[12]

(1) *BAJI No. 2.60.* This instruction, as modified, read: "The plaintiffs have the burden of proving by a preponderance of the evidence all of the facts necessary to establish: [¶] 1. That defendants or any of them was negligent; [¶] 2. That the negligence of the defendants or any one of them was a cause of *injury*[13] and damage to the plaintiffs; and [¶] 3. The nature and extent of the *injuries* claimed to have been suffered by plaintiffs, the elements of

---

[12]In our recitation of these instructions we have highlighted the trial court's use of the word "injury" or "injuries." Given the court's dispositive concern about the use of such word(s) in BAJI No. 3.77, we find the unquestioned use of the same words in other instructions truly puzzling.

[13]We note that although the trial judge's written jury instructions stated that it was plaintiffs' burden to prove "2. That the negligence of the defendants or any one of them was *a* cause of injury and damage to the plaintiffs . . . ," when she read this burden of proof

plaintiffs' damages, and the amount thereof. The defendant has the burden of proving by a preponderance of the evidence all of the facts necessary to establish: [¶] 1. That the defendant was negligent; [¶] 2. The decedent's negligence contributed as a cause to [*her death*]." (Italics added.)[14]

Dr. Limansky argues that the words "defendants or any of them" somehow describes concurrent or multiple causation. We again disagree. BAJI No. 3.77 explains that there may be more than one cause of an injury. It does not make it clear that all of the defendants acting concurrently with each other, or nondefendant medical personnel, the plaintiffs, or even Cynthia herself, could each be found responsible for causing her death. Likewise, BAJI No. 2.60 does not define the term "concurrent cause." In short, BAJI No. 2.60 is not, and was not intended to be, an adequate instruction on the law of concurrent or multiple causes.

(2) *BAJI No. 3.53.* This instruction defined contributory negligence: "Contributory negligence is negligence on the part of a decedent which, combining with the negligence of a defendant, contributes as a cause in bringing about death. [¶] Contributory negligence, if any, on the part of the decedent does not bar a recovery by the [heirs] . . . against the defendant but the total amount of damage to which the [heirs] . . . would otherwise be entitled shall be reduced in proportion to the amount of negligence attributable to the decedent."

Dr. Limansky relies heavily upon this instruction to support his argument that the jury was effectively and sufficiently instructed with respect to multiple concurrent causes. We disagree. This instruction does not clarify that there may be more than one cause of an injury. The isolated portion of the text emphasized by Dr. Limansky, *"Contributory negligence is negligence on the part of a decedent which, combining with the negligence of a defendant, contributes as a cause in bringing about death"* (italics added), does not clarify that there can be more than one cause of an injury. This instruction does nothing to clarify that nondefendant medical personnel or even the plaintiffs can each be found responsible for causing Cynthia's death. Likewise, it does not define the term "concurrent cause" and it is not adequate instruction on the law of concurrent or multiple causes.

---

instruction (BAJI No. 2.60, as modified) to the jury, she stated, "The negligence of the defendants or any one of them was *the* cause of injury and damage to the plaintiffs. . . ." (Italics added.) In and of itself this was not a significant error since the jury was apparently given access to the written instructions during their deliberations and the special verdict form referred to the defendants' negligence as "*a* cause." However, in the context of the failure to give BAJI No. 3.77 and the critical nature of the causation issue, it cannot help but be another factor in our consideration of the question of prejudice.

[14]The original concluding text of BAJI No. 2.60 was crossed out and the words "her death" were handwritten in place of the original text. Why the trial judge could not have done this with respect to BAJI No. 3.77 is beyond this court's understanding.

(3) *BAJI No. 3.76* defines legal cause: "The law defines cause in its own particular way. A cause of *injury*, damage, loss or harm is something that is a substantial factor in bringing about an *injury,* damage, loss or harm." (Italics added.)

This instruction certainly does not clarify that there may be more than one cause of an injury as Dr. Limansky argues. Nor does it inform the jury that all of the defendants acting concurrently with each other, or nondefendant medical personnel, the plaintiffs, or even Cynthia herself, could each be found responsible for causing her death. Again, this instruction does not define the term "concurrent cause" and is not adequate instruction on the law of concurrent or multiple causes. Furthermore, as the Use Note to BAJI No. 3.77 directs: "Except as noted, *this instruction should be given immediately following BAJI 3.76 whenever the issue of negligence of two or more defendants or contributory negligence is submitted to the jury.*" (Use Note to BAJI No. 3.77, *supra*, p. 100, italics added.) While BAJI No. 3.76 was given in a form which twice used the word "injury," BAJI No. 3.77 was refused specifically because it contained that word.

(4) *BAJI No. 6.28* relates to a patient's duty to follow instructions: "A patient has a duty to follow all reasonable and proper advice and instructions regarding care, activities and treatment given by such patient's doctor. [¶] A doctor is not liable for any *injury* resulting solely from the negligent failure of the patient to follow such advice and instructions. [¶] However, if the negligence of the doctor is a cause of *injury* to the patient, the contributory negligence of the patient, if any, in not following such advice and instructions, does not bar recovery by the patient against the doctor but the total amount to which the patient would otherwise be entitled shall be reduced in proportion to the negligence attributable to the patient." (Italics added.)

Like the other instructions cited by Dr. Limansky, BAJI No. 6.28 does not point out that there may be more than one cause of an injury. The isolated portion of the text emphasized by him, *"if the negligence of the doctor is a cause of injury to the patient, the contributory negligence of the patient . . . does not bar recovery by the patient against the doctor"* (italics added), simply does not clarify that there can be more than one cause of an injury or even define or explain the term "concurrent cause."

(5) *BAJI No. 14.91*, as modified, described the apportionment of negligence: "In order to determine the proportionate share of the total fault attributable to the decedent, you will of necessity be required to evaluate the combined negligence of the decedent and the negligence of the defendants whose negligence contributed as a cause to decedent's death. [¶] In comparing the fault of such persons you should consider all of the surrounding circumstances as shown you by the evidence."

BAJI No. 14.91 also does not explain that there may be more than one cause of an injury. The isolated portion of the text emphasized by Dr. Limansky, *"the combined negligence of the decedent and the negligence of the defendants whose negligence contributed as a cause to decedent's death"* (italics added), does not clarify that there can be more than one cause of an injury. Rather, it professes that negligence may be combined. Like the others, it does not clarify that all of the defendants acting concurrently with each other, or nondefendant medical personnel, the plaintiffs, or even Cynthia herself, could each be found responsible for causing her death. Finally, it does not define the term "concurrent cause" and therefore is not adequate instruction on the law of concurrent or multiple causes.

Thus, each of these instructions falls short in providing a ground for Dr. Limansky's argument that the omission of BAJI No. 3.77 caused plaintiffs no prejudice because the jury was otherwise adequately instructed. None of these instructions was designed to explain multiple causation. That is what BAJI No. 3.77 is for. Unfortunately for plaintiffs, the jury never received the explanation on this critical issue which the law required.

d.   *The Jury's Verdict*

Finally, while the jury did not request a rereading of any instructions, it was two and one-half days in deliberation and did return a special verdict finding the defendant to have been negligent in his treatment of the decedent, but, by the minimum margin of nine to three, concluded that such negligence was not a cause of her death.

We are satisfied that plaintiffs have carried their burden of demonstrating the existence of prejudice to them resulting from the trial court's refusal to give BAJI No. 3.77. Whatever the relative merits of the parties' opposing arguments regarding plaintiffs' claim, the plaintiffs were entitled to a fair trial. This they did not receive. We must reverse.

DISPOSITION

The judgment is reversed and the matter is remanded for a new trial on all issues. On remand, this case shall be assigned to a different trial judge. Plaintiffs shall recover their costs on appeal.

Kitching, J., and Aldrich, J., concurred

A petition for a rehearing was denied April 30, 1999, and respondent's petition for review by the Supreme Court was denied June 16, 1999.