[Nos. B191514, B192883. Second Dist., Div. One. Oct. 17, 2008.]

RICHARD ALCALA et al., Plaintiffs and Appellants, v.
VAZMAR CORPORATION, Defendant and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts I., III., IV., and V.

## Counsel

Ourfalian & Ourfalian and Rafi Ourfalian for Plaintiffs and Appellants.

Tropio & Morlan, Scott T. Tropio, Christopher J. Hammond and Jon M. Kasimov for Defendant and Respondent.

## Opinion

HASTINGS, J.[*]—Plaintiffs Richard and Angie Alcala appeal from a defense verdict rendered in favor of defendant Earthbound Tire Center in a wrongful death action. In the published portion of this opinion, we conclude that the trial court did not commit error when it declined to instruct the jury on negligence per se. In the unpublished portion of this opinion, we conclude that the verdict was supported by substantial evidence, but that the trial court committed prejudicial error by refusing to admit a highly relevant and admissible statement made by defendant. Accordingly, we reverse the judgment in favor of defendant and order a new trial.

---

[*]Retired Associate Justice of the Court of Appeal, Second Appellate District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

## BACKGROUND

A. *The accident.*

On November 30, 2002, Andrew Alcala, who was 18 years old at the time, sustained fatal injuries after losing control of his vehicle (a PT Cruiser) in the rain and colliding with another vehicle going the opposite direction on Sierra Highway in Santa Clarita, California.

B. *The trial.*

Richard and Angie Alcala, the decedent's parents, brought a wrongful death action against Earthbound Tire Center (Earthbound), which had serviced the PT Cruiser just two weeks before the accident.[1] They alleged that it negligently repaired, approved, authorized, maintained, inspected, and serviced the PT Cruiser.

At trial, the parties presented starkly different versions of the events leading up to the accident.

### 1. *The June 17, 2002 service.*

Richard Alcala testified that he had known the owner of Earthbound, Vic Minassian, for 10 years and regularly brought his family's cars to Earthbound for new tires and service. Richard believed Minassian was knowledgeable about the services he performed and usually followed Minassian's recommendations.[2] On June 17, 2002, approximately six months before the accident, Richard brought the PT Cruiser to Earthbound with the intention of buying four new wheels. Along with the new wheels, Minassian recommended four new tires and a front-end alignment. Richard testified that he agreed with Minassian's recommendations and instructed him to "do it all at one time." Richard left the car, returned some time later in the afternoon, and paid, believing that Minassian had performed the front-end alignment and that the new tires were under warranty.

Minassian testified that when Richard initially brought the PT Cruiser into Earthbound in June 2002, Richard only agreed to pay for four new wheels and tires. After Richard left the car for service, Minassian inspected the car

---

[1] Vazmar Corporation, the entity named as defendant in the underlying complaint, does business as Earthbound Tire Center.

[2] We refer to Richard Alcala as Richard and Angie Alcala as Angie for clarity, and not out of disrespect for the parties.

and saw that the front two tires had exposed steel due to extensive wear. He disposed of these worn front tires, along with the rear tires, and installed four new tires (manufactured by Dunlop) on the car. According to Minassian, when Richard came to pick up the car, Minassian warned him of the following: (1) it was dangerous driving on tires with exposed steel, (2) the front axle required an alignment, (3) if Richard did not get a front-end alignment, the new front tires would suffer the same wear as the tires Minassian had just removed, and (4) if Richard did not get an alignment that day, the new tires he had just purchased would not come with a warranty. Minassian testified that despite these warnings, Richard elected not to have the alignment at that time. Minassian, however, did not make any notations in the work order or invoice documenting his warnings to the Alcalas.

### 2. *The November 16, 2002 service.*

Richard testified that on November 16, 2002, he and his wife brought the PT Cruiser to Earthbound again because he "didn't like the way it was driving" and he wanted Minassian to check the tires. The Alcalas left the car at Earthbound and when they returned to pay for the service, Minassian informed Richard that he had rotated the tires and performed a front-end alignment. According to Richard, Minassian did not inform him that the front tires (which Minassian had rotated to the rear) were extremely worn, did not recommend that he buy new tires, and did not warn him it was dangerous to leave the worn tires on the car. Richard testified that had Minassian advised him he needed new tires, Richard would have purchased them without hesitation or questions. According to Richard, "[a]s long as he told me I needed tires, that was good enough for me." Angie testified that she used her credit card to pay for the service, but she never spoke to Minassian on that date.

In contrast, Minassian testified that he did not remember seeing Richard on November 16. According to Minassian, Angie brought the PT Cruiser to Earthbound and instructed Minassian to perform an alignment, rotate the tires, and change the oil. After Angie left and service on the PT Cruiser began, Minassian saw that the car's two front tires were severely worn and "unsafe." The damage extended beyond the "secondary rubber" and "was almost to the steel." Minassian testified that he went to the fast-food restaurant next door to find Angie and when he could not find her, he called the phone number contained in his records for the Alcalas. After no one picked up, Minassian went ahead and rotated the tires by moving the front worn tires to the rear, and the rear tires to the front. He performed the rotation despite his belief that the worn tires posed a danger to the occupants of

the vehicle, possibly a danger to the public, and "were bad [under] any standards."

According to Minassian, when Angie returned to pay for the service, he informed her that she needed two new tires to replace the worn tires and she responded "I will tell [Richard], and we will do it later." Minassian admitted that he did not explain to Angie that the tires were bald, nor did he warn her of the dangers associated with driving on tires with such extensive wear. Again, Minassian did not document the fact that he recommended two new tires in the work order or invoice.

### 3. The expert testimony on tire placement.

Harold Herzlich, the tire industry expert retained by the Alcalas, testified that by 2002, there was a "consensus growing" in the tire industry that newer tires (i.e., tires with less wear) should be installed on the rear wheels. As early as 1994, Dunlop, the manufacturer of the tires Minassian sold to plaintiffs, issued regular bulletins instructing service providers to install newer tires on the rear wheels. Not all manufacturers, however, believed that newer tires should be installed in the rear and in 2002, the Rubber Manufacturers Association did not have a standard recommendation on the issue.

Additionally, Herzlich examined the worn tires on the PT Cruiser and identified areas on the tires "that go down to less than 1/32nd" of an inch and other areas with "exposed fabric." According to Herzlich, this extensive wear "strongly" affected the traction of the tires, especially on wet roadways. Herzlich further testified that when a tire retailer encounters dangerously worn tires, such as the tires Minassian found on the PT Cruiser, the retailer should convince the customer to "get rid" of the tires, warn the customer about the "danger" associated with driving on worn tires, and if the customer rejects the advice, the retailer should refuse "to touch the vehicle" and document his warnings to the customer.

### 4. The expert testimony on causation.

Michael Varat, the accident reconstructionist retained by the Alcalas, testified that their son lost control of the vehicle because the rear tires, which were worn down to the steel, lost traction with the road and caused the entire vehicle to fishtail and spin. Varat also testified that when a service provider rotates damaged or worn tires from the front axle to the rear axle, like Minassian had done two weeks before the accident, the provider decreases the safety of the vehicle on both wet and dry roadways. According to Varat,

placing worn tires on the rear axle of a vehicle increases the chances that the vehicle will lose control due to inadequate traction or suffer a tire blowout.

Paul Guthorn, the accident reconstructionist retained by Earthbound, testified that the Alcalas' son lost control of the car because he was driving at an excessive speed over a wet roadway, which caused the tires to hydroplane. Guthorn agreed that the tires on the PT Cruiser had worn down to such an extent that they should have been replaced under industry standards, but maintained that the accident would have occurred, given the speed and the water conditions, even if the tires had a tread depth of 6/32 of an inch.

5. *The verdict and subsequent appeal.*

The jury unanimously found that Earthbound was not negligent. The Alcalas moved for a new trial asserting numerous errors. The trial court denied the motion for new trial and the Alcalas timely appealed.

## DISCUSSION

I. *Substantial Evidence.*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

II. *Instructional error.*

A. *Standard of review.*

■ Upon request, a party is entitled to correct, nonargumentative instructions on every theory of the case advanced by the party that is supported by substantial evidence. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 [34 Cal.Rptr.2d 607, 882 P.2d 298] (*Soule*).) "The trial court may not force the litigant to rely on abstract generalities, but must instruct in specific terms that relate the party's theory to the particular case." (*Ibid.*)

On an appeal claiming jury instructional error, including claims that the court improperly refused an instruction, we view the evidence in the light most favorable to the appellant. In such cases, we assume that the jury might have believed the evidence upon which the instruction favorable to the appellant was predicated. (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2006) ¶ 8:149, p. 8-99 (rev. # 1, 2006), citing

---

[*]See footnote, *ante*, page 747.

*Henderson v. Harnischfeger Corp.* (1974) 12 Cal.3d 663, 674 [117 Cal.Rptr. 1, 527 P.2d 353].)

"A judgment may not be reversed on appeal, even for error involving 'misdirection of the jury,' unless 'after an examination of the entire cause, including the evidence,' it appears the error caused a 'miscarriage of justice.' (Cal. Const., art. VI, § 13.)" (*Soule, supra*, 8 Cal.4th at p. 574.) "Instructional error in a civil case is prejudicial ' "[w]here it seems probable" ' that the error prejudicially affected the verdict. [Citation.] It is not enough that there may have been a 'mere possibility' of prejudice. [Citation.]" (*Logacz v. Limansky* (1999) 71 Cal.App.4th 1149, 1156 [84 Cal.Rptr.2d 257].) "Thus, when deciding whether an error of instructional omission was prejudicial, the court must also evaluate (1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Soule, supra*, 8 Cal.4th at pp. 580–581.)

### B. *No error was committed.*

Based upon Vehicle Code sections 27465 and 27501, the Alcalas requested that the trial court instruct the jury on negligence per se. They argue the court erred by failing to so instruct.

■ The negligence per se doctrine is codified in Evidence Code section 669, subdivision (a), under which negligence is presumed if the plaintiff establishes four elements: (1) the defendant violated a statute, ordinance, or regulation; (2) the violation proximately caused death or injury to person or property; (3) the death or injury resulted from an occurrence the nature of which the statute, ordinance, or regulation was designed to prevent; and (4) the person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted.

"[A]pplication of the doctrine of negligence per se means that the court has adopted the conduct prescribed by the statute as the standard of care for a reasonable person in the circumstances." (*Casey v. Russell* (1982) 138 Cal.App.3d 379, 383 [188 Cal.Rptr. 18].) "In such a case, a violation of the statute is presumed to be negligence." (*Ibid.*) A defendant may rebut the presumption of negligence with "proof" that "violating the statute, ordinance, or regulation . . . might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law . . . ." (Evid. Code, § 669, subd. (b).)

With the foregoing in mind, we turn to the statutes in question. As pertinent, Vehicle Code section 27465 provides:

"(a) No dealer or person holding a retail seller's permit shall sell, offer for sale, expose for sale, or install on a vehicle axle for use on a highway, a pneumatic tire when the tire has less than the tread depth specified in subdivision (b). This subdivision does not apply to any person who installs on a vehicle, as part of an emergency service rendered to a disabled vehicle upon a highway, a spare tire with which the disabled vehicle was equipped.

"(b) No person shall use on a highway a pneumatic tire on a vehicle axle when the tire has less than the following tread depth, except when temporarily installed on a disabled vehicle as specified in subdivision (a):

"(1) One thirty-second (1/32) of an inch tread depth in any two adjacent grooves at any location of the tire . . . ."

Similarly, Vehicle Code section 27501 provides:

"(a) No dealer or person holding a retail seller's permit shall sell, offer for sale, expose for sale, or install on a vehicle for use on a highway, a pneumatic tire which is not in compliance with regulations adopted [by the Department of Transportation]. This subdivision shall not apply to any person who installs on a vehicle, as part of an emergency service rendered to a vehicle upon a highway, a spare tire with which such disabled vehicle was equipped.

"(b) No person shall use on a highway a pneumatic tire which is not in conformance with such regulations."

■ It is clear from the language of the statutes that Vehicle Code sections 27465 and 27501 were enacted in an attempt to remove unsafe tires from vehicles using the roadways and highways of the state. Subdivision (a) of both statutes precludes dealers and retail sellers of tires from installing such tires and subdivision (b) of both statutes prevents any person from using such tires.

The trial court concluded that neither statute was applicable under the circumstances presented because it interpreted each as requiring an installation in connection with a sale, not a tire rotation.

The Alcalas argued below, and now on appeal, that a tire rotation is no different than an "installation" and therefore Vehicle Code sections 27465 and 27501 are applicable. Earthbound argues that both statutes are "meant only to prohibit a dealer or retail seller from installing a worn tire as part of a sale of

either the tire itself or of a vehicle equipped with the tire." Neither statute, Earthbound maintains, "prohibits a repair shop from *reinstalling* a tire that it removed from the car" even if the tire is dangerously bald.

In assessing the parties' claims, we are guided by established canons of statutory construction:

■ " ' "In construing a statute, our role is to ascertain the Legislature's intent so as to effectuate the purpose of the law. [Citation.] In determining intent, we must look first to the words of the statute because they are the most reliable indicator of legislative intent. [Citation.] If the statutory language is clear and unambiguous, the plain meaning of the statute governs. [Citation.]" ' " (*Absher v. AutoZone, Inc.* (2008) 164 Cal.App.4th 332, 339 [78 Cal.Rptr.3d 817] (*Absher*).) " 'But the "plain meaning" rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose or whether such a construction of one provision is consistent with other provisions of the statute. . . . The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act.' " (*Absher, supra,* 164 Cal.App.4th at p. 340.) " 'An interpretation that renders related provisions nugatory must be avoided [citation]; each sentence must be read not in isolation but in the light of the statutory scheme [citation]; and if a statute is amenable to two alternative interpretations, the one that leads to the more reasonable result will be followed [citation].' " (*Ibid.*)

■ " 'When the plain meaning of the statutory text is insufficient to resolve the question of its interpretation, the courts may turn to . . . the legislative history of the enactment. "Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent." ' " (*Absher, supra,* 164 Cal.App.4th at p. 340.) " 'Finally, the court may consider the impact of an interpretation on public policy, for "[w]here uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation." ' " (*Ibid.*)

Under the plain language of both statutes, a dealer or retailer of tires cannot "sell, offer for sale, expose for sale, or install on a vehicle" a tire that does not meet applicable tread depth requirements. There is nothing in the plain language of either statute to suggest that the word "install" is limited only to those tire installations that are incident to a sale. Even though the word "install" is preceded three times by the word "sale" and its variations, as Earthbound points out, it is also preceded by the word "or," a disjunctive phrase that separates it from the previous words. (*In re Jesusa V.* (2004) 32

Cal.4th 588, 622 [10 Cal.Rptr.3d 205, 85 P.3d 2] [The " ' "ordinary and popular" ' meaning of the word 'or' is well settled. [Citation.] It has a disjunctive meaning: 'In its ordinary sense, the function of the word "or" is to mark an alternative such as "either this or that." ' "].) Therefore, we must construe the meaning of the word "install" as intended by the Legislature.

In 1970, the Legislature added sections 27465 and 27501 to the Vehicle Code to address concerns raised by the California Highway Patrol (CHP) "that worn tires are much more likely to fail as well as hydroplane on a wet surface."[3] (Assem. Com. on Transportation, Analysis of Assem. Bill No. 733 (1970 Reg. Sess.) p. 1.) The Legislature agreed with the CHP that worn tires "constitute a definite hazard," and recognized that regulation over such tires was "grossly lacking." (Enrolled Bill Rep. on Assem. Bill No. 733 (1970 Reg. Sess.) p. 1.) In response, the Legislature passed both provisions to "repeal[] the present tire standards applicable to the sale of new passenger vehicle tire and permit[] the establishment of standards for tires which are sold, installed, or used on a vehicle when operated upon a highway." (Assem. Com. on Transportation, Analysis of Assem. Bill No. 733 (1970 Reg. Sess.) p. 1; see also Enrolled Bill Rep. on Assem. Bill. No. 733 (1970 Reg. Sess.), pp. 1–2 [legislation "would establish standards for tires which are sold, installed or used on a vehicle when operated upon a highway"].)

The Assembly Journal describes the intent of Assem. Bill No. 733 (1970 Reg. Sess.) as follows:

"Because worn tires are much more likely to fail and skid particularly on wet surfaces, they constitute a particular hazard to safety on the highway.

"California does not now prescribe standards for vehicle tires after they have been sold or installed for the first time.

"To better protect tire users, Assemblyman Jerry Lewis has submitted an Administration bill, AB 733, which will permit setting high safety standards for all tires, *resold or new*, in use on motor vehicles in the state.

"The law will define the minimum amount of tire tread and durability necessary for a vehicle to operate safely on our highways. It will also prohibit the *sale of used and recap tires* which fail to meet safety standards established by the California Highway Patrol." (1 Assem. J. (1970 Reg. Sess.) p. 976, italics added.)

---

[3] Both provisions were contained in one bill, Assembly Bill No. 733 (1970 Reg. Sess.), which was enacted as Statutes 1970, chapter 216, page 469.

In 1971, the Legislature amended both Vehicle Code sections 27465 and 27501 to include an express exemption for emergency roadside service providers who replace a failed tire with a spare tire that does not meet the minimum requirements of the statutes.[4] (Assem. Com. on Transportation, Rep. on Assem. Bill No. 1977 (1971 Reg. Sess.) as amended May 24, 1971, p. 1.) Because emergency roadside service providers also have retail seller's permits, the Legislature recognized that under the 1970 legislation, those service providers would violate the law by aiding a stranded motorist. (Assem. Com. on Policy, Material on Assem. Bill No. 1977 (1971 Reg. Sess.) quoting from letter to Committee Consultant Samuel Bruce and Assemblyman Joe Gonsalves; see also Assem. Com. on Transportation, Rep. on Assem. Bill No. 1977 (1971 Reg. Sess.) as amended May 24, 1971, p. 1 ["Under the current law, the tow truck operator violates the law if he installs such a tire."].) The amendments "would permit a person providing emergency service to install an otherwise unlawful tire in order to get a disabled vehicle off the highway." (Assem. Com. on Transportation, Rep. on Assem. Bill No. 1977 (1971 Reg. Sess.) as amended May 24, 1971, p. 1.)

■ Taking into consideration the legislative history, and specifically the italicized language within the Assembly Journal quoted above referring to "used and recap tires," we agree with Earthbound that the statutes were not intended to apply when a tire *mounted on the vehicle is removed and remounted* thereon by the dealer or retail seller. This construction is consistent with the intent of the 1971 amendment to protect emergency roadside service operators who remove a failed tire and replace it with a spare tire which does not meet the minimum requirements of the sections. And such a construction reflects common sense. Any other interpretation would prevent repair shops (that happen to sell tires) from performing routine service jobs that require the removal and reinstallation of tires (e.g., replacing worn brakes) on any vehicles with tires having less than the required tread depth. Such a result certainly does not comport with the Legislature's stated purpose of increasing road safety.

The trial court did not err in declining to instruct the jury on negligence per se based on Vehicle Code sections 27465 and 27501.

III.–V.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[4] The amendments to both Vehicle Code sections 27465 and 27501 were contained in one bill, Assembly Bill No. 1977 (1971 Reg. Sess.), which was enacted as Statutes 1971, chapter 510, page 1003.

*See footnote, *ante*, page 747.

## DISPOSITION

We reverse the judgment and order a new trial.[7] Plaintiffs are awarded their ordinary costs on appeal.

Mallano, P. J., and Rothschild, J., concurred.

---

[7] Because we reverse and order a new trial, we do not reach plaintiffs' appeal from the trial court's order denying their motion to tax costs.