Filed 12/17/14  Kelly v. EZ Rider CA4/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| MATTHEW S. KELLY, | D063065 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2010-00096994-CU-PA-CTL) |
| EZ RIDER & COMPANY, et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of San Diego County, John S. Meyer, Judge.  Affirmed.

Aitken, Aitken, Cohn, Wylie A. Aitken; Law Offices of William J. Kopeny and William J. Kopeny for Plaintiff and Appellant.

Higgs, Fletcher & Mack, John Morris, Peter S. Doody, Virginia L. Price and Victoria E. Fuller for Defendants and Respondents.

After a jury trial in this action for personal injury, plaintiff and appellant Matthew S. Kelly obtained a judgment that apportioned fault and proportionally awarded him damages.  Kelly was on his bicycle at an intersection of San Diego city streets when

he was hit by a big rig truck driven by defendant and respondent Ubaldo Rosales, while Rosales was employed by defendant and respondent EZ Rider & Company (EZ Rider; collectively Rosales).[1] The jury determined that both Rosales and Kelly had been negligent and that Kelly had sustained over $5 million in damages due to his profound injuries. Rosales's comparative fault was set at 25 percent and Kelly's at 75 percent. The judgment reduced his damages accordingly to an award of $1,460,657.48.

On appeal, Kelly chiefly argues the trial court erred in denying his requests to instruct the jury with his proposed special instructions based on several Vehicle Code[2] sections that Rosales had allegedly violated at the time of the accident, as well as a related negligence per se instruction (CACI No. 418). (E.g., § 21460, subds. (a), (b) [generally driver of vehicle shall not drive to the left of double parallel lines, except as the section otherwise permits].) Kelly also requested that the jury be instructed about certain Vehicle Code sections that arguably supported his arguments that he had acted lawfully in riding his bicycle as he did, by stopping in a crosswalk in front of Rosales's stopped truck at the red light, before Rosales started to turn and hit Kelly there. (E.g., § 21650, subd. (g) [operation of bicycles on shoulder of highway or sidewalk or bicycle

---

[1] Pursuant to stipulation, the jury was told that EZ Rider would be responsible for the acts of Rosales, under principles of vicarious liability and respondeat superior. There are no separate issues on appeal about the conduct of EZ Rider.

[2] All further statutory references are to the Vehicle Code unless noted. City streets are considered highways under section 360, as "a way or place of whatever nature, publicly maintained and open to the use of the public for purposes of vehicular travel. Highway includes street." Under section 590, a " 'street' is a way or place of whatever nature, publicly maintained and open to the use of the public for purposes of vehicular travel. Street includes highway."

path "or along any crosswalk" is not prohibited by the section, if such operation is not otherwise disallowed]; CACI No. 710 [comparing vehicle and pedestrian standards of care].)  The trial court refused these requests, and Kelly claims prejudicial error.

Kelly also argues on appeal that the trial court erroneously denied his counsel's request to use a demonstrative aid during closing argument, a computer-created slide of an altered view from the driver's seat of the truck.  Further, Kelly argues the trial court misinterpreted the applicable restrictions on the number of experts that can be presented on a given topic, and thus it should have allowed his designated human factors expert (a psychologist who had trucking experience) to testify additionally about trucking standards of care.  (Evid. Code, § 723.)  Finally, cumulative prejudicial error is claimed.

We have examined the arguments in light of the record and determine that the judgment must be affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

*A.  The Accident and Investigation*

At about 10:30 a.m. on Friday, December 18, 2009, 24-year-old Kelly was riding his bicycle from one of his places of part-time work to another, when he arrived at the intersection of Orange and Fairmount Avenues, going eastbound on Orange.  It was a sunny day and the traffic signal at the intersection was working properly.

At the same time, Rosales, a professional truck driver from Arizona, was driving an 18-wheeler tractor trailer truck (the truck) on EZ Rider business, going east on Orange to make another pickup and delivery within the city.  There were no signs prohibiting such trucks from driving on those multi-lane streets, which are in a mixed commercial

3

and residential area. Rosales stopped the truck, which was 48 feet long, at the limit line for a red light at the intersection, in the right hand lane that allowed a driver to go straight or turn right. The height of the leading edge of the cab of the truck, at the front of the hood and grill on the driver's side, was 5'11".

As Rosales was stopped at the red light for some 30 to 90 seconds, he watched for pedestrians at the intersection to see if they were going to cross the street, and looked to his right side for cars that were coming from behind. He used the mirrors on both sides of his truck, seeing no movement in them. According to the directions he received from his dispatcher, he was planning to make a right turn, so he signaled a right turn with his blinking light.

As the truck was standing at the intersection, Kelly rode up alongside it in the same lane that allowed a driver to go straight or turn right, and he passed its wheels on the left side.[3] Kelly stopped at the red light, in the crosswalk about 12-15 feet ahead and to the left of the grill of Rosales's truck, where he thought he would be visible to the driver. For about a minute, Kelly was balancing on his wheels in a "track stand," making him about five feet in height in total, located at the far side of the crosswalk line. At that moment, Rosales began to make a right-on-red turn onto Fairmount, by slowly moving forward past the Orange limit line and edging into the oncoming lanes, over the painted lines. Because of the turning radius of the truck, Rosales believed it was necessary to

_____

[3] An investigating police officer, Kazimierz Lewak, testified that when he interviewed Kelly at the hospital shortly after the accident, Kelly told him that he must have passed Rosales's truck on the right side. However, witnesses and Kelly later testified that he had actually passed the truck on the left, which is no longer in dispute.

4

edge over the lines and previously, he had done so safely. Rosales knew there was a blind spot in front of the truck, due to the length of its chassis, and that the view of some of the crosswalk was blocked when he stopped. He explained, "It's not possible to stay really far away because then you allow a lot of space in front from the limit line and the tractor."

As Rosales's truck moved forward in first gear, Kelly heard its noise increase, but he did not have time to react before its left front tires hit his bike where he had been balancing at the crosswalk line. The impact of the truck knocked the bike and rider to the left, dragging and grinding Kelly's body into the pavement under its wheels. Kelly was screaming, but Rosales was unaware of any impact as he turned, until he saw a pedestrian waving and telling him to stop. He immediately stopped and got out. He saw Kelly pinned under one of his front wheels, and within 30-60 seconds, he got back in the truck and moved it four feet slowly in reverse, releasing Kelly from being crushed.

Rosales stayed with Kelly until an ambulance arrived and police cleared Rosales to go. The investigating officers prepared police reports (not admitted into evidence). Police officer Dale Van Horn inspected Rosales's truck after the accident and did not find any visual obstructions in the cab or equipment violations.

### B. Trial; Kelly's Case

Kelly was hospitalized for over six weeks for treatment of his fractured and crushed pelvis, destroyed genitalia, fractured collarbone, and soft tissue injuries. Over

5

the past five years, he has undergone extensive follow-up surgeries and treatment for his continuing injuries.[4]

This lawsuit went to trial in 2012. Kelly filed trial briefs, including one on the proposed limits of expert testimony. The court heard numerous in limine motions and deferred ruling on many of them concerning the scope of expert testimony, in favor of seeing how the issues developed at trial. The court referred to the rules that there would be only one expert allowed per area of testimony. The court denied a defense request to bifurcate the issues of liability and damage, on the ground that it would not save any trial time. That ruling is not challenged here. The court precluded any testimony on whether Rosales or Kelly was cited for any traffic infractions for the accident (they were not).

The jury heard testimony from Kelly, who said he had never seen a large commercial vehicle at this intersection, which he had often ridden through. He estimated that he had stopped approximately a car length, 12-15 feet, in front and to the left of the truck, since he did not believe it was safe to wait behind the truck, where he might be rear-ended. An eyewitness to the accident estimated that Kelly had been stopped about 15 feet ahead of the truck, when it was stopped at the red light. When the truck slowly began to turn, its left wheels ran over Kelly.

Each side called several expert witnesses to address, among other things, the estimated visibility from the cab of Rosales's truck, depending on factors such as the

---

4     Before trial, Kelly dismissed two governmental defendants in the transportation field.

pieces of the interior that affected the driver's visibility (posts, dashboard and steering wheel), the position of the driver's seat, and the length, height and slope of the hood.

Kelly designated four experts to testify at trial (although he did not call his trucking expert, Timothy Reust). His human factors/ergonomics expert, Anthony Stein, explained to the jury his understanding of how people interact with their environment. Stein, who previously had a trucker's license, testified about the working situation of a truck driver, analyzing how different factors inside the cab can affect a driver's visibility. Drivers need to be cognizant of the risks in traffic, pedestrians, mirrors, and the "blind spots" that are inherent in driving a truck, and they may need to adjust or shift around in their seats, such as when looking in a crosswalk. The court cautioned Kelly's counsel to restrict Stein's testimony away from whether the truck driver had operated correctly or incorrectly, or whether the bicyclist had done so.

Kelly's accident reconstructionist, Edward Fatzinger, testified from the evidence that as Rosales's truck was beginning the right turn, it "was positioned such that the left side tires of the tractor-trailer were on or around the lane line dividing the left-turn lane and the straight through-lane." At that time, Kelly was stationed at the limit line of the crosswalk, putting himself about 10-15 feet in front of the truck. Thus, the "area of impact was at approximately the right or east crosswalk line of the west crosswalk." Fatzinger prepared exhibits showing simulations of where the various vehicles were during the sequence.

Kelly's biomechanics expert, Jeffrey Wheeler, inspected the physical evidence from the accident (the bicycle and its scrape patterns, photographs, etc.), and surveyed

7

the accident scene. He testified about the models and exhibits he had created to illustrate the scene and the events of the injury sequence. He explained that the bicycle's handlebars were three feet from the ground, and the tires of the truck were three feet, three inches high. The leading edge of the grill of the truck was taller than the bicycle and Kelly's head combined.

## C. Defense Case

In Rosales's testimony, he said that the driver's seat moves up and down, and since he is short (5'4"), it was in the lowest position so that he could reach the pedals. Making the right turn required him to move into the left turn lane on Orange, to have enough space to make a right turn with safety. This required him to go across part of the double yellow line. He did not expect anyone to place themselves in front of the grill of his truck at the intersection, and he had never before seen a vehicle, bike or motorcycle pass his stopped truck, to get in front of his truck at a crosswalk, when his truck was first in line. He never saw that anyone was in his path until after the accident.

The defense trucking expert, Larry Miller, testified that he drove a car through the route Rosales drove, and found it was not inappropriate for a large truck. No signs were posted prohibiting a right-on-red turn at the intersection of Orange and Fairmount Avenues, and making a right turn at the intersection was within a trucker's standard of care. Rosales had acted properly in stopping behind the crosswalk, since he had to see around the building to his right.

Gerald Bretting, the defense bicycling and accident reconstruction expert, testified that he took measurements of the dimensions of the truck and where Rosales said he was

8

sitting in the cab.. He was seeking to determine Rosales's "line of sight" and "what [was] visible from that position." As a driver, Rosales had to position his truck far to the left to make the wide right turn, to avoid having his trailer tires go over the curb.

According to Bretting, while Kelly was doing his track stand, he would have measured about five feet tall, shorter than the truck grill height. If Kelly had been closer than 15 feet to the front of Rosales's truck, he would not have been visible as a cyclist balancing there. Using simulated reconstructed photographs he had prepared, Bretting's opinion was that Kelly was probably positioned about 8-12 feet from the front of Rosales's truck, and that consequently, Kelly would have been completely invisible to Rosales from the driver's seat. However, if Kelly had been 15 feet ahead of the cab, he would have been partially visible "between the leading edge of the cab and the top part of the steering wheel."

Bretting acknowledged that the higher up Rosales was actually sitting, the more he would have been able to see in front of the truck. Rosales's view could have changed from different angles, and the steering wheel "seems to at least block some of the view." Depending on where Rosales's eyes were positioned, Kelly's bike would have been more or less visible. Rosales could have looked under the steering wheel. Bretting could not find any information that anyone had documented the position of the seat at the time of the accident.

In Bretting's opinion, bicyclists should ride "predictably" and defensively, because they present a very small profile and are hard for vehicle drivers to see. He did not think

9

it would be "predictable" for a bicyclist to pass a stopped truck at a red light and reach a position in front of the truck.

Mark Sanders, the human factors expert for the defense, testified his analysis showed that Rosales's eyes were likely blocked in part by the steering wheel and/or the hood of the truck. Nothing had prevented Rosales from "moving his head right and left [or] from leaning over to look around the steering wheel," so long as he could still reach the pedals. Generally, a truck driver approaching an intersection and coming to a stop at the limit line, when no one was in the crosswalk, would not be expecting to see anyone else there. If Kelly had been located 10 feet in front of Rosales's truck, he would have been totally obscured, and at about 15 feet, it would be extremely unlikely that he would have been visible.

### D. Verdict, Judgment, and Appeal

Kelly submitted briefs on jury instructions he was requesting, and numerous conferences on instructions were held, as will be further described in part I, *post*. After the case was submitted to the jury, the court dealt with several jury notes, one of which requested further instructions on negligence. The court responded that the jury should consult its copy of instruction CACI No. 401, regarding the definition of negligence in terms of the exercise of reasonable care.

During argument, Kelly's attorney sought to use a demonstrative aid, a slide representing what would happen to the truck driver's viewpoint, if one took away the steering wheel. He planned to use it to suggest that if Rosales had more diligently looked above or below the steering wheel, he would have been able to see Kelly on the bicycle.

10

The court refused permission, stating that nothing could be shown to the jury that had not been admitted into evidence. Counsel continued to argue to the jury that if Rosales had moved his head an inch, he would have been able to see more from the driver's seat.

After a few days of deliberations, the jury asked for testimony to be read back from both human factors experts, as well as the defense's accident reconstructionist and truck driving expert. The court replied, "This will entail 2 days of the court reporter reading her notes in the jury room. Is this what you want?" The jury took a break, and two and a half hours later, notified the court that it had reached a verdict.

The jury verdict determined nine to three that Rosales had been negligent and that his actions were a substantial factor in causing the injuries to Kelly. The special verdict found by a 12 to 0 vote that Kelly had been negligent, also substantially causing his own injuries. The jury set Rosales's degree of fault at 25 percent, while Kelly's was 75 percent. The jury set Kelly's entire damage amount at $5,842,629.93. The judgment accordingly awarded him the amount of $1,460,657.48. Kelly sought a new trial or an additur, which were denied. He timely appealed.

DISCUSSION

We first address Kelly's contentions of various forms of prejudicial instructional error. We then turn to the issues raised about his counsel's proposed use of a demonstrative aid in argument, the limitations that were placed upon the testimony offered by his human factors expert, and his contention that cumulative error requires reversal of the judgment.

11

# I

## *INSTRUCTIONAL ERROR CLAIMS*

### A. Background and Issues Presented

Kelly mainly focuses on whether the jury received inadequate instructions to assess properly the comparative fault in this case. In discussions with counsel, the court said it was viewing the case as one of straight negligence, such that special instructions with Vehicle Code language would not be appropriate. The court pointed out that nobody had identified a violation of the law, such as speeding or an illegal turn.[5] The court said it would be venturing onto a slippery slope to begin to give such marginally relevant instructions, and it therefore denied Kelly's requests for the statutorily based instructional language, except for section 21200.

By agreement of counsel, the court gave such a special instruction based on section 21200, subdivision (a), on the basic duty of care of a bicyclist as follows: "Every person riding a bicycle upon a highway has all the rights and is subject to all the provisions applicable to the driver of a vehicle by this division." The jury was generally instructed on the essential factual elements of negligence and substantial factor causation. According to the definitions of negligence in CACI Nos. 400 and 401, the jury was told it

---

[5]    In his appellate briefs, Kelly continues to argue that Rosales violated several statutes, as described *post*. However, he cannot point to any place in the record establishing that Rosales did. Kelly only complains that the defense experts misinterpreted the law, and he offers different interpretations on appeal. The real question is whether the trial court correctly treated this as a "straight negligence" case, and as will be shown, it did.

must decide how a reasonably careful person would have acted in Kelly's or Rosales's situations.

Among other standard instructions, the trial court gave CACI No. 205, regarding the failure of a party to explain or deny certain evidence. The court also gave a standard comparative fault instruction, CACI No. 405. Pursuant to CACI No. 411, the jury was told that any person has a right to expect that others will use reasonable care, unless he or she has reason to know that the other person will not do so.

The trial court further instructed the jury in the language of CACI No. 700, on the duty of a driver to use reasonable care. "Drivers must keep a lookout for pedestrians, obstacles, and other vehicles. They must also control the speed and movement of their vehicles. The failure to use reasonable care in driving a vehicle is negligence."

Kelly contends it was error for the trial court to deny his requests to supply additional jury instructions based on statute, which he claims were supported by the evidence. First, he proposed instructions based on several Vehicle Code sections that Rosales had allegedly violated in making his right turn, as well as a related negligence per se instruction (CACI No. 418). (E.g., § 21453, subd. (b) [driver generally can turn right on steady red signal light after stopping, but must yield right-of-way to pedestrians lawfully within crosswalk and to approaching vehicles, "and shall continue to yield the right-of-way to that vehicle until the driver can proceed with reasonable safety"].)

Next, Kelly requested that the jury be instructed about certain Vehicle Code sections that arguably supported his arguments that he had acted lawfully in riding his bicycle as he did. (E.g., § 231 [definition of bicycle]; § 21650, subd. (g) [operation of

13

bicycles on shoulder of highway or sidewalk or bicycle path "or along any crosswalk" is not prohibited by the section, if such operation is not otherwise forbidden]; see CACI No. 710 [respective duties of care of drivers and pedestrians].)

## B. Applicable Standards

" '[A] party is entitled to have the jury instructed as to his theory of the case provided (1) that he requests and submits legally correct instructions, and (2) that there is sufficient evidence to support the theory.' " (*Thompson Pacific Construction, Inc. v. City of Sunnyvale* (2007) 155 Cal.App.4th 525, 547.)

In reviewing a claim that the trial court improperly refused a requested jury instruction, we view the evidence in the light most favorable to the party who requested the instruction. (*Alcala v. Vazmar Corp.* (2008) 167 Cal.App.4th 747, 754 (*Alcala*).) "[W]e assume that the jury might have believed the evidence upon which the instruction favorable to the [requesting party] was predicated." (*Ibid.*)

To the extent that statutory interpretation is required in reviewing the validity or possible effect of proposed instructions, we utilize a de novo standard of review for such questions of law. (*Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 82; *Spriesterbach v. Holland* (2013) 215 Cal.App.4th 255, 263 (*Spriesterbach*).) Determining the existence of a legal duty to use reasonable care under a particular set of facts is a question of law for the trial court to decide. (*Phillips v. TLC Plumbing Inc.* (2009) 172 Cal.App.4th 1133, 1139.) Interpretation of the statutes' applicability to the evidence as given presents such a legal question for analyzing the adequacy of the proposed instructions.

14

Judgments are not reversed for instructional error unless the error caused a miscarriage of justice. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574 (*Soule*); *Alcala, supra,* 167 Cal.App.4th 747, 755.) The court must evaluate probable prejudice by taking into account the state of the evidence, the effect of other instructions and of counsels' arguments, and any indications by the jurors that they were misled. (*Soule*, *supra*, at pp. 580-581.)

If a given instruction is found to be erroneous, reversal is required only if it appears probable that the improper instruction misled the jury and affected its verdict. (*Spriesterbach*, *supra*, 215 Cal.App.4th 255, 273.) This standard applies to Kelly's claim that the instruction given on the basic duty of care of a bicyclist (§ 21200, subd. (a)) was inadequate, even though he originally joined in requesting it.[6] After further describing the content of each proposed instruction, we analyze the arguments about them.

C. Statutory Instruction Requests on Conduct of Defendant; Analysis

Kelly contends he presented sufficient evidence at trial to support additional jury instructions based on statute, to highlight his theories on comparative fault that Rosales acted unlawfully in making the right turn. Kelly's proposed instructions in this respect

[6]    The instruction given based on section 21200 only included its basic concept that a bicycle rider has all the rights and is subject to all the regulations applicable to a vehicle driver. The parties do not point to any evidence at trial that would have required the giving of any instruction additionally addressing other provisions of section 21200, such as the statutory language, "except those provisions that by their very nature can have no application." No issues are presented about that exception, nor about the other provisions of section 21200, subdivision (a) (making it unlawful for any person to ride a bicycle upon a highway while under the influence of an alcoholic beverage and/or any drugs). Likewise, no issues are raised about section 21200, subdivision (b), regarding a peace officer's operation of a bicycle during the course of his or her duties.

15

were mainly based upon section 21460, subdivision (a) (driver of vehicle shall not drive to the left of double parallel solid yellow lines, except as the section permits), and upon section 21650, subdivision (a) (generally, vehicle is to be driven on the right half of the roadway, except when overtaking/passing another vehicle that is proceeding in the same direction).

Additionally, Kelly relies on the "reasonable safety" language in section 21453, subdivision (b) (driver generally can turn right on steady red signal light after stopping, but must yield right-of-way to pedestrians lawfully within crosswalk and to approaching vehicles, "and shall continue to yield the right-of-way to that vehicle until the driver can proceed with reasonable safety"). Section 22106 also contains "reasonable safety" language ("No person shall start a vehicle stopped, standing, or parked on a highway . . . until such movement can be made with reasonable safety.").

According to Kelly, Rosales made an illegal right turn on red, by extending his left wheels over the painted dividing lines into the Orange Avenue left turn lane and/or the Fairmount Avenue oncoming lanes. Section 21460, subdivisions (a), (b) and (c) require that a vehicle shall not drive to the left of double parallel solid yellow or white lines, except that if one line is broken, the driver on the side of the roadway where the broken line is in place may cross over the double lines or drive to the left of the double lines when overtaking or passing other vehicles.[7]

---

7     Section 21460, subdivisions (a) through (c) read as follows: "(a) If double parallel solid yellow lines are in place, a person driving a vehicle shall not drive to the left of the lines, except as permitted in this section. [¶] (b) If double parallel solid white lines are in

It is not disputed that neither Rosales nor Kelly were cited for any traffic violations arising out of the accident, and no police reports were introduced into evidence. However, the expert opinion testimony varied on whether Rosales had made the right turn on red with due care, under all the circumstances, including the degree of visibility from his driver's seat and the intrusion of his left wheels into the opposite lanes. It is not necessarily illegal to cross double yellow lines, and under some situations, that can be a legitimate driving maneuver. Specifically, section 21460, subdivisions (a), (b) and (c) as a whole allow a vehicle to drive to the left of double parallel solid yellow or white lines if one line is broken, such that the driver may cross over the double lines or drive to the left of the double lines when overtaking or passing other vehicles.

Under section 21453, subdivisions (a) and (b), a driver must stop at the marked limit line for a steady circular red signal, but if no sign prohibits turning on red, the driver may turn right, while yielding the right-of-way to pedestrians lawfully within an adjacent crosswalk. Then, with respect to "any vehicle that has approached or is approaching so closely as to constitute an immediate hazard to the driver," section 21453, subdivision (b)

---

place, a person driving a vehicle shall not cross any part of those double solid white lines, except as permitted in this section [or by Section 21655.8, covering HOV lanes]. [¶] (c) If the double parallel lines, one of which is broken, are in place, a person driving a vehicle shall not drive to the left of the lines, except as follows: [¶] (1) If the driver is on the side of the roadway in which the broken line is in place, the driver may cross over the double lines or drive to the left of the double lines when overtaking or passing other vehicles [¶] . . . ." (Although § 21460.5 is mentioned in § 21460, subd. (b)(2) as applying to two-way left turn lanes, these facts do not include a left turn.) Section 21460, subdivision (d) is not argued to apply (covering a left turn at an intersection or into/out of driveway or private road, or a legal U-turn, or a turn from designated offcenter traffic lanes). Neither does section 21460, subdivision (e) apply (allows raised pavement markers).

17

requires the driver making such a legal right turn at a red signal light, after stopping, to yield the right-of-way to vehicles approaching from the other directions and in other lanes. This right turn thus required Rosales to yield to oncoming traffic, while he was temporarily going into the opposite lanes while turning. Further, section 21453, subdivision (b) requires that the driver making such a turn "shall continue to yield the right-of-way to that vehicle until the driver can proceed with reasonable safety."[8] Essentially, these sections provide that making a right turn under these circumstances required the truck driver to face and pass oncoming vehicles, while yielding the right-of-way to promote reasonable safety.

Under section 22106, "[n]o person shall start a vehicle stopped, standing, or parked on a highway . . . until such movement can be made with reasonable safety." Based upon the evidence of what Rosales apparently did or could perceive, he evaluated this turning situation as reasonably safe, but tragically, it was not. Referring to all of these related code sections, Kelly argues that the bicycle instruction that was given, based on section 21200, was simply inadequate to address all his arguments on comparative negligence.

We cannot agree, because Kelly's ongoing claim that Rosales acted illegally is not supported by the record or the statutes relied upon. The driver making a right-on-red turn must yield the right-of-way to pedestrians and to vehicles in view, by acting in a reasonably safe manner, whether those vehicles are oncoming or going the same

---

8    Section 21453, subdivisions (c), dealing with red arrows or (d), pedestrians, are not applicable here.

direction. (§ 21453, subd. (b); § 21460, subd. (a).) Under the instructions as given, the jury had a full opportunity to evaluate whether Rosales could perceive Kelly where he was balancing in front of the truck, or whether Rosales reasonably should have been able to do so, with reference to all the factual circumstances and the legal definitions of due care. The proposed added statutory language would not have added any useful or essential concepts to enable the jury to more precisely decide the comparative fault issue.

Arguably, defense counsel somewhat oversimplified the issues when arguing that "*if a car can't do it, a bike can't do it*. If a Ford Taurus couldn't pass Mr. Rosales's truck and get in front of him and stop in the crosswalk, then a bicyclist couldn't do it." Theoretically, there are some things a bicycle can do that a car cannot do, such as riding the opposite direction on a sidewalk, within the boundaries of section 21650.1. (*Spriesterbach*, *supra*, 215 Cal.App.4th 255, 270 [bicycles need not travel in the same direction as vehicular traffic when ridden on a "sidewalk"; pt. I.E., *post*].) But that is not this case, where there was evidence that Kelly as a bicyclist was acting in an unusual and unpredictable way, by sharing a single traffic lane and taking over the lead position at the red light, relatively too close to the grill of the truck, as it turned out.

For instructional purposes, the trial court properly analyzed the statutes in determining the scope of the legal duties of reasonable care under this set of facts. (*Phillips v. TLC Plumbing Inc.*, *supra*, 172 Cal.App.4th 1133, 1139.) We find no error in the refusal of Kelly's proposed Vehicle Code special instructions.

19

## D. Negligence Per Se

Based upon the same supposed violations of the Vehicle Code, Kelly sought to have CACI No. 418 given on negligence per se, to shift the burden of proof to Rosales. (*Hargrave v. Winquist* (1982) 134 Cal.App.3d 916, 925.) CACI No. 418 would have provided that if the jury found the defendant violated a specified statute, regulation, or ordinance, it would have proceeded by determining whether:

> "[T]he violation was a substantial factor in bringing about the harm, [&] then you must find that [defendant] was negligent [unless you also find that the violation was excused].

> "If you find that [defendant] did not violate this law or that the violation was not a substantial factor in bringing about the harm [or if you find the violation was excused], then you must still decide whether [defendant] was negligent in light of the other instructions."

All four elements of Evidence Code section 669 must be shown in support of a claim of negligence per se. These are the defendant's violation of a statute, ordinance, or regulation, which proximately caused injury to the plaintiff; that the "injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent;" and that the injured person was within the intended class of protected persons. (*Ibid.*; *Newhall Land & Farming Co. v. Superior Court* (1993) 19 Cal.App.4th 334, 347.) Whether a person violated such a statute and whether the violation proximately caused injury are normally questions for the trier of fact. (*Daum v. SpineCare Medical Group, Inc.* (1997) 52 Cal.App.4th 1285, 1306.) Whether the injury resulted from an occurrence that the statute was designed to prevent and whether the injured person was among the class of protected persons are questions of law. (*Ibid.*)

20

Without more clearly identified terms of the Vehicle Code sections that Rosales is said to have violated, the jury should not have been given the opportunity to decide pursuant to CACI No. 418 that certain ones were violated, and whether proximate cause of these injuries was shown. Kelly did not provide a sufficient factual and legal basis for the giving of his requested negligence per se instruction.

E.  Refusal to Give Requested Instructions on Plaintiff's Own Conduct; Analysis

Kelly next offered several instructions using Vehicle Code language to support his position that his own operation of his bicycle at the time of the accident was nonnegligent and within the law. His requests were denied, which he contends was prejudicial error.

Mainly, Kelly sought to have an instruction given based on the following language of section 21650, subdivisions (a) and (g), generally providing that vehicles shall be driven upon the right half of the roadway, except that the operation of bicycles is not prohibited upon "any shoulder of a highway, on any sidewalk, on any bicycle path within a highway, *or along any crosswalk* or bicycle path crossing, where the operation is not otherwise prohibited by this code or local ordinance."  (§ 21650, subd. (g); italics added.)[9]  Kelly argued that the jury needed to hear this language in order to evaluate properly his presence on his bicycle in the crosswalk, ahead of Rosales's truck, at the time of the accident.

---

[9]    Section 21650, subdivision (a) provides:  "Upon all highways, a vehicle shall be driven upon the right half of the roadway, except as follows:  [¶] (a) When overtaking and passing another vehicle proceeding in the same direction under the rules governing that movement."

21

We disagree, because when Kelly stopped at the crosswalk, he was not utilizing his bicycle "along" a crosswalk, such as walking his bicycle across the street. He has not brought the facts of his case within the plain language of section 21650, subdivision (g).

Likewise, when Kelly requested that the court instruct the jury in the language of CACI No. 710 (respective duties of care for pedestrians and drivers), the trial court responded that the facts of how the accident occurred were not seriously disputed. No pedestrians or children in the crosswalk were involved, nor any speeding vehicles. Kelly nevertheless claims error with respect to that refusal to give CACI No. 710, which reads: "The duty to use reasonable care does not require the same amount of caution from drivers and pedestrians. While both drivers and pedestrians must be aware that motor vehicles can cause serious injuries, drivers must use more care than pedestrians." (See *Cucinella v. Weston Biscuit Co.* (1954) 42 Cal.2d 71, 80-81 [such an instruction informs the jury that ordinary care duties vary with the responsibility involved and depend upon the character of the instrumentality being used or the nature of the act being performed, as related to surrounding circumstances].)

Kelly's argument that because he was in the crosswalk, he should be viewed as the equivalent to a pedestrian, is not supported by statute or other authorities. The statutory definition of a pedestrian under section 467, subdivision (a)(1) expressly excludes a bicyclist ("a 'pedestrian' is a person who is afoot or who is using any of the following: [¶] (1) a means of conveyance propelled by human power other than a bicycle."). Historically, the case law imposing greater duties of care upon drivers as compared to pedestrians deals with situations in which the driver either saw, could have seen, or

22

should have seen the pedestrian, such as in a crosswalk or crossing a street. (See, e.g., *Kuist v. Curran* (1953) 116 Cal.App.2d 404, 406-408 [automobile has greater potential of inflicting harm than pedestrian]; *Dawson v. Lalanne* (1937) 22 Cal.App.2d 314, 315.) As noted by the trial court, Kelly as a bicyclist was not occupying the pedestrian crosswalk as a pedestrian at the time of the accident. Even in view of the size and weight differences between this bicycle and this truck, Kelly cannot claim any heightened duties of care or protection from pedestrian status, for purposes of evaluating his request for CACI No. 710. Instead, the general instruction given under section 21200 adequately set forth the respective duties of the driver and the bicyclist, in this "straight negligence" context. (*Cucinella v. Weston Biscuit Co.*, *supra*, 42 Cal.2d 71, 80-81 [ordinary care duties vary with the responsibility involved as related to surrounding circumstances].)

Kelly also requested that the jury be instructed in the language of section 231, which defines a bicycle as a human powered wheeled device, stating that, "Persons riding bicycles are subject to the provisions of this code specified in Sections 21200 and 21200.5." (§§ 231, 21200.5 [prohibits riding a bicycle under the influence of alcoholic beverages or drugs, but there are no facts about alcohol or drugs in this case].) This definition of a bicyclist would not have added any useful information for the jury, which had already been advised that under section 21200, subdivision (a),"[a] person riding a bicycle . . . upon a highway has all the rights and is subject to all the provisions applicable to the driver of a vehicle by this division."

It is not disputed that Kelly was traveling in the same direction as the vehicular traffic, including the truck. He therefore argues that the trial court should have given his

23

proposed instruction using the language of section 21650.1, that "A bicycle operated on a roadway, or the shoulder of a highway, shall be operated in the same direction as vehicles are required to be driven upon the roadway." (§ 21650.1.) The statutory definition of "a 'roadway' is 'that portion of a highway improved, designed, or ordinarily used for vehicular travel.' (§ 530.)" (*Spriesterbach*, *supra*, 215 Cal.App.4th 255, 270.) Under these facts, this instruction would have added nothing useful.

It is also not disputed that Kelly was not riding on the sidewalk. Therefore, a recent interpretation of section 21650.1 is irrelevant, that it does not require bicycles to travel in the same direction as vehicular traffic when ridden on a "sidewalk." (*Spriesterbach*, *supra*, 215 Cal.App.4th 255, 269-273; § 555 [a sidewalk is a pedestrian's portion of a highway].) In that case, the plaintiff was riding his bicycle on the sidewalk in the opposite direction of street traffic, and was hurt when a driver exited a parking lot and hit him. Under section 21650.1, the bicyclist was not deemed to be negligent per se, merely because he was not going in the same direction as vehicles, because he was not on the highway or roadway.

In the case before us, we cannot see how any requested instruction based on section 21650.1 would have been helpful to show that Kelly was riding legally or with due care when he stopped in the crosswalk in front of the truck, even though they were going in the same direction. Instead, the instruction given pursuant to section 21200, that "[a] person riding a bicycle . . . upon a highway has all the rights and is subject to all the provisions applicable to the driver of a vehicle by this division," adequately covered that ground. (§ 21200, subd. (a).)

24

In conclusion, Kelly did not show that any instructional error occurred to cause any probable prejudice, in light of the state of the evidence, the effect of other instructions on duties of care, and the import of the respective arguments by counsel. (*Soule*, *supra*, 8 Cal.4th at pp. 580-581.) There is no clear indication in the record that the jurors were misled about their duty to properly evaluate Kelly's or Rosales's conduct, in light of the applicable comparative negligence principles they were given.

II

*DENIAL OF USE OF DEMONSTRATIVE AID TO ARGUMENT*

A. Issues Presented and Facts

On appeal, Kelly contends the trial court's refusal to allow him to use a demonstrative aid, a slide of a visual simulation of the truck driver's viewpoint if the steering wheel were taken away, violated his right to have the jury consider a major theory of the defendant's liability. (See *John B. Gunn Law Corporation v. Maynard* (1987) 189 Cal.App.3d 1565, 1573.) Kelly sought to use the slide to argue to the jury that if Rosales had looked farther above or below the steering wheel, he would have seen Kelly on the bicycle.

The record shows that the issue arose when counsel had completed the presentation of evidence and the court was preparing for closing arguments, by discussing their proper scope. The court reminded counsel that only items admitted into evidence could be shown to the jury. When Kelly's counsel began his argument, he told the jury that Rosales could have simply looked above or below the steering wheel, and when starting to put up his slide, counsel said "[W]e're going to show you what would

25

happen if you take away the steering wheel."  Rosales's objection was sustained, but Kelly's counsel responded that he was only "making a presentation as if [Rosales] had moved [his head], [and] this is what he would have seen."  The trial court again told him that if this presentation had not been admitted into evidence, counsel could not do that. Counsel told the jurors that they could nevertheless use their logic and common sense as he was suggesting.

Later in argument, defense counsel asked the jury to consider why Kelly had not produced a truck driving expert witness to testify that Rosales had not acted in a reasonably careful manner, either in choosing his route or in using that method of making the turn.  She referred to photographs prepared by their accident reconstruction expert, showing what the truck driver could see if the bicyclist were positioned five feet, 10 feet, or 15 feet away from the cab of the truck.  In rebuttal, Kelly's attorney further discussed the visibility issue by referring to the same photographs and also to diagrams presented by his own accident reconstructionist.

## B.  Authorities and Analysis

A demonstrative aid is properly admissible to illustrate and clarify a witness's testimony to the jury.  (*People v. Ham* (1970) 7 Cal.App.3d 768, 780.)  The demonstrative evidence or aid must be substantially similar to that which it seeks to illustrate, to be supported by an adequate foundation in the evidence.  (*Ibid*.)  The trial court has discretion to determine whether a proposed demonstrative aid lacks a proper foundation or has a possible misleading effect.  (*County of San Mateo v. Christen* (1937)

26

22 Cal.App.2d 375, 378; 2 Witkin, Cal. Evidence (5th ed. 2012) Demonstrative, Experimental, and Scientific Evidence, § 26, p. 39.)

In *People v. Barnett* (1998) 17 Cal.4th 1044, 1135-1136 (*Barnett*), the Supreme Court evaluated a trial court's decision to permit the prosecutor to display to the jury, during closing argument, a demonstrative aid that had not been admitted into evidence at trial. That was a knife similar in appearance to the actual weapon used in the charged crime. No error or abuse of discretion under Evidence Code section 352 resulted, because the testimony at trial had "provided a sufficient basis for the knife's display," and "there was no attempt to mislead the jury into believing the knife was the actual murder weapon." (*Barnett, supra,* at p. 1136.)

We presume the jury followed the court's instructions on the use of admitted evidence, and did not incorrectly rely upon facts from the argument of counsel. (*People v. Valdez* (2004) 32 Cal.4th 73, 114, fn. 14.) The jury was made aware that an attorney's comments are advocacy and do not constitute evidence. (See *Spriesterbach, supra*, 215 Cal.App.4th 255, 274.)

Using those analytical approaches, we cannot find that Kelly adequately created a foundation to justify use of this apparently newly created slide or proposed exhibit. It is unclear from the briefs whether the proposed demonstrative item, to show a different potential view from the steering wheel, was in any way included in the exhibits. Although Kelly's reply brief states that the exhibits will be transmitted to the court before oral argument, they have not been received. (See *People v. Buttles* (1990) 223

Cal.App.3d 1631, 1639-1640 [adequate record required for effective appellate review of claim about demonstrative evidence].)

Next, the record does not show a specific offer of proof was made to enable the trial court or this court to determine the accuracy or admissibility of the proposed demonstrative aid. (See *Semsch v. Henry Mayo Newhall Memorial Hospital* (1985) 171 Cal.App.3d 162, 168.) We cannot assume the accuracy of such an item, based on mere descriptions in the briefs. This record does not allow any determination of whether it amounted to a fair representation of the relevant underlying testimony or evidence.

In any event, both sets of experts had thoroughly addressed various visibility issues from the driver's seat of the truck, and Kelly's counsel continued to argue to the jury that Rosales should have taken more care to look over, under, or through the steering wheel at the time of the accident. In response, defense counsel referred to photographs and exhibits on that subject created by the accident reconstructionists. There was a danger that the jury would be misled by a newly created slide that was not authenticated by a witness. (*Barnett*, *supra*, 17 Cal.4th 1044, 1135-1136.)

Even without this simulation being presented to the jurors, Kelly was able to suggest that they could draw logical inferences from the evidence about the presence or absence of the steering wheel parts, with respect to Rosales's line of sight and conduct at the time of the accident. Contrary to Kelly's arguments, the jury was not precluded from hearing an essential theory of trial, and it had adequate evidence to consider about visibility, in light of all the arguments made.

28

We therefore disagree with Kelly that the court's decision to restrict the use of exhibits to admitted exhibits could have amounted to reversible error or an abuse of discretion. (Evid. Code, § 354, subd. (a) ["A verdict or finding shall not be set aside, nor shall the judgment . . . be reversed, by reason of the erroneous exclusion of evidence unless . . . [t]he substance, purpose and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means"]; see *Soule, supra*, 8 Cal.4th 548, 574.) Without such error, no basis for reversal has been shown in this respect.

III

*NUMBER OF EXPERT WITNESSES; NO CUMULATIVE ERROR*

A. Background

Kelly contends the court erred in refusing to allow his human factors expert, psychologist Anthony Stein, to give additional expert testimony about trucking standards of care. Kelly designated Stein as his human factors and bicycling expert, outlining his expected expert testimony as involving human operator performance in the subject accident, visual factors, accident reconstruction and probable cause. (Code Civ. Proc., § 2034.260.) Stein's experience included holding a trucking license between 1978 and 2008. Although Kelly also designated a trucking expert, Timothy Reust, he did not call him as a witness.

As a human factors expert, Stein testified about the behavior of the truck driver and the bicycle rider, and addressed the work environment of the truck driver in terms of his seating position and general "visibility issues along the side of the truck." However,

29

when Kelly sought to inquire from Stein about his driving experience as a trucker, defense counsel objected. The trial court discussed the matter with counsel, telling Kelly's counsel that Stein's testimony should be restricted to his designated area of expertise, human factors. The trial court then cautioned Kelly's counsel that Stein was not a trucking expert, "and I just want to make sure you understand the limitations." Kelly's counsel informed the court that Stein had also done trucking research. The trial court reminded counsel that Stein had not been designated as a trucking operations expert.

At that point, Kelly's counsel suggested that an area of inquiry would be why EZ Rider had not kept in better contact with the driver, regarding the route to use to get to his next job (since Kelly was then arguing Rosales should not have been told to drive on city streets; that argument is not being pursued on appeal; see fn. 1, *ante*). The trial court responded: "That's not a human factors opinion." The court reiterated that Stein would be allowed to testify regarding the ergonomics of a truck cab and what would be expected of a trucker in certain situations, but not about his opinions on the standard of care for driving a truck.

Stein's opinions about the "work environment" inside a truck included concepts such as how to compensate for its blind spots and for its great size and limited maneuverability. The trial court reminded Kelly's counsel that Stein's personal opinions or his personal experience based on driving a truck were irrelevant here. Further similar testimony was given, and Stein underwent cross-examination about a truck driver's

obligations (e.g., ensuring that traffic is clear and there are no pedestrians in the path of a turn).

## B. Authorities and Analysis

Evidence Code section 723 provides: "The court may, at any time before or during the trial of an action, limit the number of expert witnesses to be called by any party." A trial court has broad discretion to rule on the admissibility of expert witness opinions, including the number of expert witnesses to be called by any party. (See *People v. Ramos* (1997) 15 Cal.4th 1133, 1175; *Horn v. General Motors Corp.* (1976) 17 Cal.3d 359, 371.) On review of a trial court's ruling that excluded an expert's opinion, the appellate court examines whether any abuse of discretion is apparent. (*Dickison v. Howen* (1990) 220 Cal.App.3d 1471, 1476; *Boston v. Penny Lane Centers, Inc.* (2009) 170 Cal.App.4th 936, 950.) In general, "discretion is always delimited by the statutes governing the particular issue." (*Zellerino v. Brown* (1991) 235 Cal.App.3d 1097, 1107.)

Code of Civil Procedure section 2034.300 provides in relevant part: "[O]n *objection of any party* who has made a complete and timely compliance with Section 2034.260, the trial court shall exclude from evidence the expert opinion of any witness that is offered by any party who has *unreasonably* failed to do any of the following: (a) List that witness as an expert under Section 2034.260." (Italics added.) If a party fails to designate an expert witness under the above provisions, the expert's testimony may be excluded where (1) the other party objects, and (2) the failure to list the expert was unreasonable.

31

Here, the trial court repeatedly told Kelly that only one expert per subject area would be allowed to testify, consistent with the expert designations made. (Evid. Code, § 723; Super. Ct. San Diego County, Local Rules, rule 2.1.11.) Rosales's counsel argued to the jury that Kelly had been unable to produce experts who could testify that Rosales had failed to meet a standard of reasonable care. It is not enough for Kelly now to argue that more evidence could have been presented in his favor about trucking, or that this is a simple matter of exalting form over substance, in light of Stein's dual sets of qualifications.

Rather, the point should be that Kelly had designated a different trucking expert, and Stein had been deposed on human factors issues, even though he also had significant experience as a trucker. Kelly is bound by the expert designations made and he has not cited to any portion of the record showing that he sought relief to expand them. (Code Civ. Proc., § 2034.610 et seq.) Even in light of the aggressive nature of the defense arguments in this respect, the court did not abuse its discretion to adhere to the expert designations made.

Finally, we reject Kelly's argument that collectively, any arguable instructional or procedural errors (if any) made it impossible for him to have a fair trial on the negligence issues, including comparative fault. (*Dam v. Lake Aliso Riding School* (1936) 6 Cal.2d 395, 399.) We are mindful of the gravity of the injuries that Kelly suffered, but must conclude he has given us no legal basis to undo the jury's verdict or the judgment of the trial court.

DISPOSITION

Judgment affirmed.  Respondents shall recover their costs on appeal.


HUFFMAN, Acting P. J.

WE CONCUR:


NARES, J.


McDONALD, J.